UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 2:18-cr-33 PPS/JEM |
| v. | ) | |
| | ) | |
| SAMANTHA ELHASSANI | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR RELEASE**

The United States of America, by Thomas L. Kirsch II, United States Attorney for the Northern District of Indiana, and Assistant United States Attorneys Abizer Zanzi and Joshua P. Kolar, submit this brief in opposition to Defendant Samantha Elhassani's Emergency Motion for Pre-Trial Release on Conditions, and Request for a Hearing [DE 49]. For the reasons explained below, the government requests that Defendant's motion be denied and that Defendant remain in custody pending trial.

**Case Overview**

On or about November 2014, Defendant's husband Moussa Elhassani informed Defendant that he and his brother wanted to go to Syria and fight for the Islamic State of Iraq and al-Sham, commonly known as ISIS. Over the next five to six months, Defendant helped the Elhassani brothers achieve their depraved ambitions by making numerous trips abroad to secure funding and tactical gear for their mission. As early as April 2015 or as late as June or July 2015, Defendant, Moussa, Moussa's brother and Defendant's two minor children crossed the border into ISIS-controlled territory in Syria through Turkey. The evidence in this case will show that Defendant knew about Moussa's and his brother's plans for months, that she laid the

groundwork for implementing their plan, and that she willfully brought her children along for the treacherous ride. Due to her reckless and selfish behavior, Defendant endangered the lives of her children and facilitated the use of her son as a trainee and propaganda tool for a savage foreign terrorist organization.

Defendant was indicted by a grand jury for conspiring with, and aiding and abetting, her husband and brother-in-law to provide material support for ISIS in violation of Title 18, United States Code Section 2339B. The indictment against Defendant is not a proxy case against the Elhassani brothers as defense counsel describes it. Defendant was charged for her own participation in the conspiracy. Importantly, the temporal scope of the indictment begins in the fall of 2014 (when Defendant first learned of her husband's intention to join ISIS) through the summer of 2015 (when Defendant and her family entered Syria). In her motion for release, Defendant refers to alleged hardships and abuse she endured after she entered Syria. The government does not doubt that there were severe consequences to Defendant and her children for her reckless and dangerous decision to help her husband and brother-in-law become ISIS fighters. However, the government has reason to doubt the accuracy of Defendant's portrayal of her life and circumstances while living under the ISIS regime. Meanwhile, Defendant herself engaged in horrifying conduct in Syria, including the purchase and supervision of Yazidi slaves.[1]

---

[1]   The Yazidis are a religious minority indigenous to a region in northern Iraq, northern Syria and southeastern Turkey. The United Nations has recognized ISIS as a perpetrator of genocide against the Yazidis. Among other atrocities, ISIS abducted and enslaved thousands of Yazidi woman and girls and sold them at auction to ISIS families.

## Factual Background[2]

Defendant and Moussa were married in July 2012. At the time, Defendant had a four year-old son from a previous relationship, referred to herein as Minor Child 1. In June 2013, Defendant and Moussa had a daughter, referred to herein as Minor Child 2, and they raised their family in Elkhart, Indiana. Defendant has consistently described Moussa prior to Syria as a loving, dedicated father and husband, who spared no expense for his family, showered her with jewelry and cars and treated Minor Child 1 as his own son.[3] *See* Sarah Childress, Joshua Baker, *Frontline*, "An American Mom Who Lives Under ISIS Rule Speaks Out"(Apr. 11, 2018).[4] Defendant and Moussa worked together managing the Elkhart branch of Viabox, a/k/a Viadress, a shipping business owned by one of Moussa's brothers.

According to Defendant's statements to the FBI, Moussa told Defendant of his desire to join ISIS in November 2014. Around the same time, Defendant and her husband Moussa began making financial and logistical preparations for the trip to Syria. Between January and March 2015, Moussa made in excess of $60,000 in purchases at precious metal dealers using their joint accounts. On November 27, 2014, a round trip flight was booked for Defendant and Minor Children 1 and 2 from Chicago to Morocco with a stopover in Turkey for travel in January 2015. On

---

[2]  The following is only a summary timeline of facts in this case. It is not a complete recitation of all of the material information obtained by law enforcement during the investigation or all of the facts that the government will seek to introduce at trial.

[3]  According to Defendant, Moussa changed his personality and became strict and abusive towards sometime after they entered Syria.

[4]  Available at https://www.pbs.org/wgbh/frontline/article/an-american-mom-who-lived-under-isis-rule-speaks-out.

December 8, 2014, Defendant used her Facebook account to try to arrange for car transportation from the airport to a bank during her anticipated layover in Turkey. In January 2015, Defendant used her PayPal account for recurring payments for a virtual private network (VPN) through a company called London Trust Media, Inc.[5]

In early January 2015, passports were issued for Minor Children 1 and 2. Federal regulations required Defendant to obtain a sworn and notarized affidavit from Minor Child 1's biological father authorizing the issuance of a passport for his son. In order to obtain his consent, in December 2014, Defendant lied to Minor Child 1's father that she needed the passport for a family vacation to Paris. Around the same time, Defendant stopped sending Minor Child 1, then seven years old, to school. For over a month, the school attempted to contact Defendant's home regarding the unexplained absences. Defendant eventually told a teacher at the school that they were moving to Mexico and that Minor Child 1 would be home-schooled. On January 7, 2015, two round trip tickets were booked for travel from Chicago to Hong Kong for Defendant and Minor Child 1 on January 31, 2015. These purchased flights were never used.

Late in the evening on January 11, 2015, Defendant and her two children (but not Moussa) traveled from Chicago to Istanbul, arriving on the afternoon of January 12. The following morning, on January 13, they traveled onto Rabat, Morocco, where they stayed with Moussa's family for approximately 10 days. Defendant has given

---

[5]   VPNs, while lawful, enable Internet users to connect to proxy servers that anonymize the user's IP address and physical location while accessing the Internet or making online transactions.

4

several inconsistent explanations of this trip. In one instance, she claimed that her family was considering a move to Morocco, and that the purpose of this trip was to check out cheap properties that were supposedly for sale.

The government learned during its investigation that Defendant never went house hunting while she was in Morocco. During the trip, a family member confronted Defendant about Moussa's interest in ISIS. Defendant responded that she supported Moussa and would follow him anywhere. Defendant indicated that they may start in Morocco before heading to Syria. When it appeared obvious that the family member did not share her views and could not be persuaded otherwise, Defendant dropped the subject. Defendant and her children returned to the United States on January 23, 2015. On January 25, 2015, Defendant sent a message to her friends and family that she "lost" the SIM card for her phone, which would have contained evidence of her data, communications and internet activity over the previous several months.

On February 10, 2015, Defendant posted on Facebook a photo of Minor Child 1 with the caption "At 60 ft with a .22. My kid is the shit." The photo depicts Minor Child 1 holding a rifle and wearing eye and ear protection at what appears to be a gun range. Another posted photo shows a target at the gun range with multiple gunshot holes. In the comments section of the post, a reader asked, "[Minor Child 1] did that?" to which Defendant replied, "Yes he did!! From 60 ft!" Later in the comments section, Defendant stated, "He's the next American sniper." In another photo posted by Defendant on the same date, Minor Child 1 is depicted holding a long gun with an assault rifle and a box of ammunition in the background. The title of the

5

photo reads, "I'm so proud of [Minor Child 1] . . . He's truly a marksman! I can't believe how good he did!"

Seven days later, on February 17, 2015, Defendant and Minor Child 1 departed Chicago for Hong Kong. During this trip, Defendant opened a safe deposit box in Hong Kong.Defendant later admitted to law enforcement that she attempted unsuccessfully to open a bank account in Hong Kong. Defendant and Minor Child 1 returned to the United States on February 26, 2015. A few weeks later, on March 16, 2015, Defendant traveled again with Minor Child 1 to Hong Kong, returning on March 18, 2015. This time, Defendant and Minor Child 1 only stayed in Hong Kong for one day. Defendant has admitted to law enforcement that she deposited at least $30,000 in cash into safe deposit boxes in Hong Kong during these trips. Prior to each of these trips, Moussa purchased several thousands of dollars worth of gold, which were likely also transported. A family member informed law enforcement that Defendant and Moussa melted down gold in the Viabox warehouse.

On March 22, 2015, just four days after returning from her second trip to Hong Kong, Defendant and her two children departed from Chicago to Hong Kong, this time accompanied by Moussa. Prior to their departure, a joint bank account held by Defendant and Moussa was drawn down. In total, over $75,000 of Defendant's and her husband's assets were depleted in the months leading up to the March 22 trip, much of which was sent to gold brokers as described above.

Defendant and her family were booked for a return flight to Chicago on March 25, 2015, which they never boarded. Instead, Moussa's brother met them in Hong

6

Kong, where they remained until April 7, 2015. During this time, Defendant helped her husband and brother-in-law acquire tactical gear, including rifle scopes and image-stabilized binoculars. Between March 28 and 31, Defendant communicated with eBay sellers based in Hong Kong asking whether she could pick up the gear in person. Defendant identified herself to one vendor as "Samantha" and stated she could provide her passport to confirm her identification. The vendor responded that she could purchase the item—described as a "Tactical CQB Combo 2.5-10x40 rifle scope with green laser and 1x22 mini red dot," directly from the vendor and suggested they meet at a mass transit railway station. Defendant also purchased image-stabilized binoculars from a company in Hong Kong using her PayPal account. In one communication, Defendant instructed the vendor not to ship the order and that she would pick them up in person as she had done with her last purchase. In a subsequent interview to law enforcement, Defendant admitted that she picked up these items.

On April 7, 2015, Defendant, Moussa, Moussa's brother and Defendant's children departed Hong Kong for Istanbul. They were all booked for travel from Istanbul to Casablanca the following day, on April 8. None of the tickets to Morocco were used. On April 7, while she was in Turkey, Defendant communicated via Facebook Messenger with one of her close friends back in Indiana and lied about her whereabouts, stating, "[w]e are heading back to Morocco today for 2 weeks and then will be back ☺ I'm so ready to be home." She later commented that she was "[s]o tired and ready to be in my bed! We will be able to get his [Moussa's] papers straightened out in Morocco too thank god." Defendant made these comments despite knowing her

husband was planning to travel to Syria directly from Turkey. The government believes that Defendant and her family left Turkey and crossed the border into ISIS-controlled territory in Syria sometime between April and July 2015.

## Governing Law

The charge Defendant faces gives rise to a presumption in favor of detention. *See* 18 U.S.C. §§ 3142(e)(3)(C) and 2332b(g)(5)(B). Though rebuttable, this presumption places a burden on the defendant to produce some evidence to show that she will not constitute a danger to the public or a serious risk of flight. The burden of persuasion demonstrating the need for detention nevertheless remains with the government. *See United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985). In particular, the government must demonstrate by a preponderance of the evidence that a defendant is a risk of flight or that she is a danger to the community by clear and convincing evidence. *See* 18 U.S.C. §3142(f).

Even if the defendant presents evidence to challenge the presumption, it remains a factor to be considered by the court. *Portes*, 786 F.2d at 764; *United States v. Dominguez*, 783 F.3d 702, 707 (7th Cir. 1986) ("Use of ['rebuttable'] in this context is somewhat misleading because the rebutted presumption is not erased. Instead, it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."). Hence, the presumption of dangerousness and risk of flight is added to the other, statutory factors that the Court must consider, including:

(1) the nature and circumstances of the offense charged, including whether the offense is a . . . Federal crime of terrorism . . . ;

8

(2)  the weight of the evidence . . .;

(3)  the history and characteristics of the person . . .; and

(4)  the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

## Argument

### I.  The Section 3142(g) Factors Weigh in Favor of Detention

#### A.  Nature and Circumstances of the Offense Charged

Defendant is charged with conspiracy to violate and aiding and abetting violations of 18 U.S.C. §2339B (material support of terrorism). Over the course of five to six months, Defendant helped her husband and brother-in-law join ISIS, a foreign terrorist organization. As summarized above, Defendant's actions and words reveal that she was not a passive or unwilling participant in the conspiracy. Defendant went to great lengths to support Moussa and her brother-in-law and made numerous trips abroad in a short period of time to physically transport funds and acquire tactical gear for use in Syria. She showed no regard for the safety and welfare of her children, and was willing to remove her son from school and use him on these planning trips, presumably to avoid suspicion.

The government assumes the Court has some general familiarity with ISIS. Nevertheless, ISIS is a foreign terrorist organization whose publicly stated purpose is the establishment of an Islamic state or caliphate based in the Middle East and Africa that encompasses all Muslims worldwide. ISIS has pursued the objective of an

9

Islamic state through, among other things, indiscriminate killing and deliberate targeting of civilians, mass executions and extrajudicial killings, persecution of individuals and communities on the basis of their religion, nationality, or ethnicity, kidnapping of civilians, forced displacement of Shia communities and minority groups, killing and maiming of children, rape, and other forms of sexual violence. ISIS has recruited thousands of foreign fighters from across the globe to assist with its efforts to expand its so-called caliphate in Iraq, Syria, and other locations in Africa and the Middle East, and has leveraged technology to spread its violent extremist ideology and for incitement to commit terrorist acts.

Defendant's willingness to provide material support to this brutal organization not only created a risk to her own family, but also benefited all those in the United States and throughout the world who share ISIS's perverted their ideology and seek to commit violence against American interests at home and abroad. Detention considerations for those who even attempt to violate §2339B "weighs heavily against the defendant. It is not a common violent crime, but rather terror that rips civilization's fabric." *United States v. Sheikh*, 994 F. Supp. 2d 736, 740 (E.D.N.C. 2014), citing *United States v. Al–Arian,* 280 F.Supp.2d 1345, 1351 (M.D.Fla.2003).

### B. Weight of the Evidence against the Defendant

As explained above, the evidence against Defendant is compelling. The evidence proffered above is based upon Defendant's oral and written statements, corroborating witnesses, business records, electronic records and other investigative techniques. The factual background section in brief only describes portion of the

10

government's evidence against Defendant. Accordingly, the strength of the evidence and the substantial penalties that Defendant faces if convicted weigh heavily in favor of continued detention.

### C. History and Characteristics and Danger to the Community

Based on numerous law enforcement interviews with family members and friends, Defendant's personal history reveals that she is an adventure-seeker, prone to recklessness and is willing to lie and use people and relationships to advance her goals. One family member reported that Defendant has a history of marijuana and heroin abuse. The same family member reported that prior to meeting Moussa, Defendant had occasionally used drugs in Minor Child 1's presence. In her intake interview, Defendant lied to the Probation Office that her only substance abuse history was marijuana as a teenager, and that she has not used any drugs since then. In other settings, she has acknowledged that she and her husband abused drugs while they were married. Defendant's sibling believes that Defendant was abusing drugs up until the time she left the United States for Syria.

Defendant's own family members describe her as dishonest, manipulative, self-interested, intelligent and savvy. In describing her life with Moussa before Syria, Defendant has repeatedly focused on the expensive vacations and elaborate gifts that Moussa bought for her. Defendant acknowledged that she knew how to manipulate Moussa to buy her new things such as expensive cars. At one point, when Moussa attempted to adopt Minor Child 1, Defendant lied to their attorney that she had no contact with her parents and did not know where they lived. Defendant also

11

continually lied to a close friend about her true location while she was in Turkey and preparing to go to Syria, falsely stating that she was in Morocco.

Defendant's counsel erroneously states that their client "has a long history of being compliant and cooperative with the FBI." DE 49, Def. Mot. ¶ 8. Before leaving for Syria, Defendant was a confidential human source for the FBI in an unrelated investigation. At the outset of this relationship and throughout its duration, Defendant was admonished by the FBI a critical rule of the relationship was that Defendant be truthful. Defendant repeatedly violated that rule by lying to FBI agents during interviews, including about her travels in the early months of 2015.

Recently, in November 2015, Defendant was engaged in a violent altercation at the jail facility at which she is housed. According to the incident report, Defendant threw coffee at another inmate's head after the other inmate called Defendant and her children names. Defendant then rushed towards the inmate and struck her. The incident was captured by video surveillance camera. Defendant was charged with assault on another inmate.

In her motion for release on bond, Defendant insists that she is not a Muslim, has never been a Muslim, and is not an ideological supporter of ISIS. Defendant's decisions and actions to support her husband's and brother-in-law's quest to become fighters for ISIS raise significant doubt about her religious, ideological and political beliefs. In any event, Defendant's characterization of her past and present religious beliefs, even if true, do not absolve her from her actions to support a foreign terrorist organization. By her own admissions to law enforcement and the media, Defendant's

12

husband Moussa was not a devout follower of Islam when he expressed a desire to join ISIS. Moreover, the suggestion by defense counsel that Defendant is somehow less dangerous because she is not a Muslim is specious and offensive to millions of law-abiding Muslim Americans who deplore ISIS and its violent agenda.

Defendant's motion portrays her as a hero to her children and other children who were with Defendant during her escape from Raqqa. The truth is that Defendant placed herself and her children in that dangerous situation and remains a continued danger to her children. And now the status of her parental and visitation rights are in jeopardy. During its investigation, the FBI obtained two home videos while Defendant and her family were living in Syria. The first video depicts Minor Child 1 in what appears to be an outside patio with an assault rifle in front of him. The child is communicating with an off-camera individual, identified as Moussa. Moussa instructs Minor Child 1 that if he successfully assembles and disassembles the rifle, he would reward Minor Child A with a suicide belt. Minor Child 1 was videotaped successfully completing the task.

The second video depicts Minor Child 1 assembling a suicide belt and discussing the components that include metal balls, three kilograms of TNT, and C4. Moussa, who is off-camera, asks Minor Child 1 the type of fuse he should use to operate the suicide belt, and what Minor Child 1 should do if "American Pigs" come to kidnap Defendant and him. Minor Child 1 responds that he would put the suicide belt under his shirt, walk outside waving his arms, and tell the American Forces that he was an American who needed help. He would then provide his name to draw them

13

closer, and as they did, he would detonate the suicide belt and go to heaven as a martyr. In a later interview with law enforcement, Defendant admitted that she filmed the video and did not tell her son that what Minor Child 1 said or proposed to do was morally wrong. [6]

In August 2017, Minor Child 1 appeared in an ISIS propaganda video promising President Trump that the battle will not end in Raqqa or Mosul, but "in your lands." The video portrays Minor Child A as an ISIS sniper with a rifle scope. The video also depicts image stabilizing binoculars similar to those purchased by Defendant in Hong Kong.

In light of Defendant's history and characteristics, and her repeated willingness to lie and manipulate others for her own self-interest, and the ongoing concern for the safety and well-being of Defendant's children who have suffered immeasurably because of her actions, the government has grave concerns about Defendant's danger to the community if released.

## II.   Defendant Fails to Rebut the Presumption Favoring Detention

Defendant's principal argument in favor of release is that she believes she is not receiving adequate mental health treatment at the jail facility at which she is housed. This argument fails for several reasons. First, Defendant has not cited and the government is not aware from its initial research of any precedent finding

---

[6]   Though less egregious, when Defendant and her children were brought back to the United States, Minor Child 2 was discovered with rotted and neglected teeth in need of treatment. Meanwhile, Defendant had in her possession toothpaste and even tooth powder, indicating that these health care items were available to Defendant at the camp where she was housed.

preferred mental health treatment as a basis for release from detention. Courts have denied release where, a defendant's "medical conditions are serious, [but] they are not beyond the ability of the United States Marshal Service [] to manage." *United States v. Varney*, 2013 WL 2406256, at *5 (E.D.Ky. 2013); *see also Johnson v. Nelson*, 877 F. Supp. 569, 571 (D. Kans. 1995) (finding "petitioner's request for 'house arrest' to obtain medical care of his choice is not persuasive"). While an acute need for medical care may justify relief, "[a] chronic condition controlled by medication is generally not an exceptional reason justifying release." *Varney*, 2013 WL 2406256, at *1, 5 (reasoning that "[a] chronic condition will be present whenever the defendant is incarcerated, so it not does not provide a unique reason why presentencing detention would be inappropriate"). Moreover, mental illness does not address a defendant's dangerousness to the community or likelihood to flee. Unlike terminal illnesses (e.g., end-stage cancer or kidney failure), mental health such as those purportedly suffered by Defendant do not counterbalance the Section 3142 factors.

Second, as a pretrial detainee, the Fourteenth Amendment protects Defendant from deliberate indifference to a serious injury or medical need. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001). In order to prevail on a claim of constitutionally inadequate medical treatment, the detainee must establish: (1) she suffers from an objectively serious injury or medical need that was deprived; and (2) the official knew that the risk of injury was substantial but nevertheless failed to take reasonable measures to prevent. *Id.* Neither Defendant's motion nor the supporting letter from Dr. Stephen Xenakis come close to meeting that burden. Even if Defendant could

15

establish those elements, the appropriate relief would be a civil remedy, not release from detention. If the true goal of the Defendant's motion is to ensure the adequate mental health treatment of Defendant, that issue should be raised with the U.S. Marshal, and only with the Court if necessary.

Third, Dr. Xenakis's letter is wholly unpersuasive regarding Defendant's present mental health condition and whether she is receiving constitutionally-adequate mental health treatment. Dr. Xenakis admits in his letter that his findings "are the products of a brief initial assessment and review of [Defendant's] case." DE 50, p. 2. Not surprisingly, there are many factual errors in his letter. Most significantly, his description of Defendant being in a "prisoner-of-war" camp is inaccurate and misleading. After Kurdish forces seized Raqqa on or about October 2017, Defendant spent most of her time in a camp for internally displaced persons (IDPs) run by Kurdish forces, known by the acronym "YPG." There is no evidence that Defendant received any mistreatment at the IDP camp. On the contrary, while housed at the camp, Defendant sent messages to her family member stating, "[e]verything here is good," and that the children were receiving a complete education with math, music and language studies (Kurdish, Arabic and English). According to Defendant, "I couldn't give the kids a better life in America. Here they get everything they want. Everything! Lol. Things are so cheap and everything is easy." Defendant also told her family that she met a boyfriend at the camp (a married YPG guard) and sent a picture of the two of them embracing.

The government has many other concerns about the credibility of Dr. Xenakis's report. Dr. Xenakis has testified or provided mental health evaluations repeatedly, if not exclusively, for defendants charged with terrorism crimes, often at the request of the specific defense attorneys in this case. His experience regarding national security issues appears to be based primarily on his work with criminal defendants, and not based on any first-hand experience while serving in the military. He left the military several years before September 11, 2001 and would have limited knowledge regarding post-9/11 national security interests. The government will raise these and other concerns at the hearing. Needless to say, Dr. Xenakis's opinions in this case should be viewed with great caution.

Finally, as of the filing of this response brief, Defendant has not proposed any release conditions that would mitigate her danger to the community or ensure her appearance in Court. Defendant is an extraordinary flight risk. Her travel history in preparation for her travel to Syria and her experience navigating through war torn Syria make her highly adept and capable of fleeing. Defendant had no qualms lying to Minor Child 1's father and school in order to transport him abroad. Her willingness to travel to a war zone with her children speaks volumes about what she would be willing to do or endure to avoid prosecution for her crimes. Defendant's family and personal relationships are highly unstable, and there are no responsible citizens who are willing and capable of ensuring her presence in the district if released on bond. An order of home detention or designation at a mental health facility with electronic monitoring provides no comfort to the government under the circumstances.

**Conclusion**

For all the reasons stated above, based on statutory factors set forth in 18 U.S.C. 3142(g) as applied to this case, and because Defendant has not overcome the statutory presumption of detention, the government respectfully requests that Defendant's motion be denied.

Respectfully submitted,

THOMAS L. KIRSCH II
UNITED STATES ATTORNEY

BY:   /s/ *Abizer Zanzi*
Abizer Zanzi
Joshua P. Kolar
Assistant United States Attorneya

*Certificate of Service*

I hereby certify that on December 19, 2018 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification to all counsel of record.

/s/ *Abizer Zanzi*
Abizer Zanzi
Assistant United States Attorney

18