IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:18 CR 33 |
| | ) | Judge Philip P. Simon |
| SAMANTHA ELHASSANI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S STATEMENT OF LAW
AND OVERVIEW OF CIPA, AND OBJECTION TO SECRET *EX PARTE*
CIPA LITIGATION OF FOURTH AMENDMENT SUPPRESSION ISSUES
AND MOTION FOR DISCLOSURE TO CLEARED COUNSEL**

**THOMAS ANTHONY DURKIN**
**THE RERUM NOVARUM HUMAN AND**
**CIVIL RIGHTS CENTER OF CHICAGO**
**DURKIN & ROBERTS**
2446 North Clark
Chicago, Illinois 60614
(312) 913-9300
tdurkin@durkinroberts.com

**JOSHUA G. HERMAN**
**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
Fax: (312) 663-3707
jherman@joshhermanlaw.com

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION.............................................................................................................. 1

II.    PROCEDURAL BACKGROUND ................................................................................. 5

III.   ARGUMENT .................................................................................................................. 6

    A.     CIPA Section 4 Should Not Be Used to Conduct *Ex Parte* Litigation and Resolution of Crucial Issues Without Any Defense Participation, Specifically Suppression Issues and Core Relevancy Determinations. .................................................. 6

        1.     Classified Evidence That is Relevant and Helpful to the Defense Must be Produced to Cleared Defense Counsel Under CIPA ............................... 7

        2.     CIPA Section 4 Does Not Permit *Ex Parte* Litigation of Fourth Amendment Suppression Issues ............................................................ 11

    B.     CIPA Section 4 *Ex Parte* Proceedings Should Not Be Used to Undermine the Adversarial Process. ................................................................ 12

    C.     CIPA Has Been Used to Conceal Complex Fourth Amendment Suppression Issues Without Defense Participation.......................................................... 17

        1.     CIPA Does Not Authorize Parallel Construction. ............................................... 20

    D.     The Prosecution Should Disclose to Cleared Defense Counsel Its Legal Standards, Arguments, and Interpretations in Support of Its Section 4 Application ....... 22

IV.    CONCLUSION .............................................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Alderman v. United States*, 394 U.S. 165 (1969) .................................................................. *passim*

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................................... 1

*Dennis v. United States*, 384 U.S. 855 (1966) ............................................................. 15

*Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002) ...................................... 14

*Guenther v. Commissioner of Internal Revenue*, 889 F.2d 882 (9th Cir. 1989).......................... 14

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951)................................... 15

*Kolod v. United States*, 390 U.S. 136 (1968) ............................................................. 11, 12, 16

*Roviaro v. United States*, 353 U.S. 53 (1957)............................................................. 11

*Stein v. Dep't of Justice & Fed. Bureau of Investigation*, 662 F.2d 1245 (7th Cir. 1981)........... 10

*United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008) ...................................... 3, 10, 22

*United States v. Acosta*, 357 F .Supp. 2d 1228 (D. Nev. 2005)...................................... 9

*United States v. Al Jayab*, No. 16 CR 181, Dkt. #115 (N.D. Ill. Jun. 28, 2018) ...................... 22

*United States v. Alderisio*, 424 F.2d 20 (10th Cir. 1970)........................................ 16

*United States v. al-Fawwaz*, No. S7 98-cr-1023 (LAK), 2014 U.S. Dist. LEXIS 173550
    (S.D.N.Y. Apr. 15, 2014)........................................................................... 3, 10, 22

*United States v. Amawi*, 695 F.3d 457 (6th Cir. 2012) .................................................... 4

*United States v. Belfield*, 692 F.2d 141 (D.C. Cir. 1982) ............................................. 12, 16, 17

*United States v. Brown*, No. 5:14-CR-58-FL, 2014 U.S. Dist. LEXIS 54143
    (E.D.N.C. Apr. 18, 2014)........................................................................... 9, 10

*United States v. Dumeisi*, 424 F.3d 566 (7th Cir. 2005)........................................ 3, 7

*United States v. Fannon*, 435 F.2d 364 (7th Cir. 1970)........................................... 2

*United States v. Hanjuan Jin*, 791 F. Supp. 2d 612 (N.D. Ill. 2011)................................ 3, 7, 8, 9

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) ........................ 15

*United States v. Klimavicius-Viloria*, 144 F.3d 1249 (9th Cir. 1998) ........................ 9

*United States v. Libby*, 429 F. Supp. 2d 18, 23 (D.D.C. 2006),
    *amended by* 429 F. Supp.2d 46 ................................................................ 4, 15

*United States v. Marzook*, 412 F. Supp.2d 913 (N.D. Ill. 2006).................................. 10

*United States v. Mejia*, 448 F.3d 436 (D.C. Cir. 2006) ...................................... 3, 7, 9

*United States v. Mohammad*, No. 3:15-cr-358, 2017 U.S. Dist. LEXIS 90720
    (N.D. Ohio June 13, 2017)........................................................................ 22

*United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004)..........................................9

*United States v. Nasser*, 476 F.2d 1111 (7th Cir. 1973) ...........................................2

*United States v. O'Hara*, 301 F.3d 563 (7th Cir. 2002)............................................3

*United States v. Poindexter*, 698 F. Supp. 316 (D.D.C. 1988) ..............................3, 6

*United States v. Price*, 566 F.3d 900 (9th Cir. 2009)................................................9

*United States v. Pringle*, 751 F.2d 419 (1st Cir. 1984)) ...........................................9

*United States v. Rezaq*, 134 F.3d 1121 (D.C. Cir. 1998) .......................................4, 9

*United States v. Sedaghaty*, 728 F.3d 885 (9th Cir. 2013).......................................10

*United States v. Smith*, 780 F.2d 1102 (4th Cir. 1985) ............................................9

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) .............................................11

*United States v. Turner*, No. 13 CR 572-2, 2014 U.S. Dist. LEXIS 105042
    (N.D. Ill. June 16, 2014) .....................................................................................8

*United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.* ("*Keith*"),
    407 U.S. 297 (1972)..............................................................................12, 17

*United States v. Varca*, 896 F.2d 900 (5th Cir. 1990) ..............................................9

*United States v. Yunis*, 867 F.2d 617 (D.C. Cir. 1989)............................................9

*Wong Sun v. United States*, 371 U.S. 471 (1963) ..............................................11, 12

**Statutes**

18 U.S.C. § 1001..........................................................................................................5

18 U.S.C. § 3504..................................................................................................16, 17

18 U.S.C. § 2.................................................................................................................6

18 U.S.C. § 2339B(a)(1)...............................................................................................5

50 U.S.C. § 1806(c) ...................................................................................................12

50 U.S.C. § 1806(f) (2000) ..........................................................................................8

Classified Information Procedures Act (CIPA)
    (codified as amended at 18 U.S.C. app. 3).............................................*passim*

**Other Authorities**

DEA Training Materials .............................................................................................20

DOJ Office of the Inspector General, *A Review of the Department of Justice's
Involvement with the President's Surveillance Program* 347–59 (July 2009) .................18, 19

John Shiffman & Kristina Cooke, *U.S. Directs Agents to Cover Up Program Used to Investigate Americans*, Reuters, Aug. 5, 2013 ................................................................. 20

S. REP. NO. 823 at 9, 96th Cong., 2d Sess. 4, reported in 1980 U.S. CODE CONG. & AMIN. NEWS 4294, 4297 ....................................................................................... 3

S. Rep. No. 95-701, at 65 (1978) ............................................................................. 17

## Rules

Fed. R. Crim. P. 16 ............................................................................................. 1, 7

## Law Review Articles

*Arjun Chandran, Note: The Classified Information Procedures Act in the Age of Terrorism: Remodeling CIPA in an Offense-Specific Manner*, 64 DUKE L.J. 1411 (2015) ......................... 2

Ellen Yaroshefsky, *Lawyers' Ethics in an Adversary System: Secret Evidence is Slowly Eroding the Adversary System: CIPA and FISA in the Courts*, 34 HOFSTRA L. REV. 1063 (2006) ................................................... 2

Joshua L. Dratel, *Symposium: Section 4 of the Classified Information Procedures Act: The Growing Threat to the Adversary Process*, 53 Wayne L. Rev. 1041 (2007) ......................... 2, 4

Laura Rovner & Jeanne Theoharis, *War, Terror, and The Federal Courts, Ten Years After 9/11: Essay: Preferring Order to Justice*, 61 AM. U.L. REV. 1331 (2012) ......................... 2

Defendant, **SAMANTHA ELHASSANI**, by and through her attorneys, **THOMAS ANTHONY DURKIN and JOSHUA G. HERMAN,** pursuant to Fed. R. Crim. P. 16, the Search and Seizure, Due Process, and Effective Assistance of Counsel clauses of the Fourth, Fifth, Sixth Amendments to the Constitution of the United States; the principles established by *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny; and the Classified Information Procedures Act (CIPA) (codified as amended at 18 U.S.C. app. 3)), respectfully submits this response to the following pleadings filed by the government: "Government's Motion for Pretrial Conference Pursuant to the Classified Information Procedures Act and Memorandum of Law in Support Thereof" (Dkt. #21) and "Statement of Law and Overview of the Classified Information Procedures Act" (Dkt. #47), and seeks further relief as set forth herein.

I.    <u>**INTRODUCTION**</u>

The government anticipates that this case will involve classified information both before and during trial. As such, the procedural mechanisms of CIPA will be utilized. The government has submitted two pleadings that provide a general overview of those procedures. (*See* Dkt. #21, 47). Those pleadings adequately identify and summarize the key sections of CIPA; however, undersigned counsel believe it necessary to provide additional information for the Court's consideration before the parties and Court fully engage in the CIPA process.

In particular, and while a CIPA Section 4 hearing has yet to be scheduled, *ex parte* proceedings under CIPA Section 4 raise a number of serious concerns, particularly from the perspective of defense counsel. To be clear, *ex parte* proceedings are not mandated and should not be considered the default, as much as the government wishes it so, especially because they harm the adversary process itself. As but one author has observed, the "reflexive acquiescence

courts have demonstrated in response to the government's *ex parte* CIPA § 4 submissions pose a serious danger to the adversary process and the values it promotes: fairness and accurate, reliable decision-making."[1]  Those concerns are very present in this case.

As discussed in more detail below, one significant risk of *ex parte* proceedings is the government's use of such secret hearings to litigate Fourth Amendment suppression issues to circumvent disclosure to defense counsel and a public, adversarial hearing.  Any attempt to advance Fourth Amendment issues in an *ex parte* setting would violate Supreme Court precedent holding that defendants are entitled—as a matter of due process—to litigate Fourth Amendment suppression questions like those at issue here in an adversarial proceeding.  *See Alderman v. United States*, 394 U.S. 165, 180-85 (1969); *United States v. Nasser*, 476 F.2d 1111, 1123 (7th Cir. 1973); *United States v. Fannon*, 435 F.2d 364, 366 (7th Cir. 1970).

This pleading also explains how, notwithstanding CIPA's procedural mechanisms, there is still a strong preference for adversarial proceedings, particularly in complex criminal

---

[1] Joshua L. Dratel, *Symposium:  Section 4 of the Classified Information Procedures Act:  The Growing Threat to the Adversary Process*, 53 Wayne L. Rev. 1041, 1049-1050 (2007). For other articles expressing concern regarding CIPA's negative impact on the adversarial process, *see also* Ellen Yaroshefsky, *Lawyers' Ethics in an Adversary System: Secret Evidence is Slowly Eroding the Adversary System:  CIPA and FISA in the Courts*, 34 HOFSTRA L. REV. 1063, 1064 (2006) (arguing that "secret evidence, which has and will continue to seep slowly into a wide range of federal criminal prosecutions, undermines the ability of defense counsel to perform her essential role and, in so doing, shifts the balance in an untenable fashion within our adversary system."); Laura Rovner & Jeanne Theoharis, *War, Terror, and The Federal Courts, Ten Years After 9/11:  Essay: Preferring Order to Justice*, 61 AM. U.L. REV. 1331, 1389 (2012) ("In terrorism trials, CIPA threatens to erode the adversarial process that is at the heart of and necessary for just criminal prosecutions. The government acts both as opposing counsel and the entity responsible for classifying and de-classifying evidence."); *Arjun Chandran, Note: The Classified Information Procedures Act in the Age of Terrorism:  Remodeling CIPA in an Offense-Specific Manner*, 64 DUKE L.J. 1411, 1443-144 (2015) ("Forbidding defense counsel from participating in determinations of materiality and relevance is indefensible in an adversarial criminal-justice system - no one but defense counsel, who has conferred with her client and developed a legal strategy, could possibly know what is material and relevant to the defense.").

proceedings.  In short, CIPA does not in and of itself permit the prosecution to withhold material facts from the defense, as Congress made clear when it stated as follows:  "[T]he defendant should not stand in a worse position, because of the fact that classified information is involved, than he would without the Act." S. REP. NO. 823 at 9, 96th Cong., 2d Sess. 4, reported in 1980 U.S. CODE CONG. & AMIN. NEWS 4294, 4297. *See also United States v. Poindexter*, 698 F. Supp. 316, 320 (D.D.C. 1988).   CIPA is a mechanism for courts to make relevancy determinations for discovery purposes.  *United States v. Hanjuan Jin*, 791 F. Supp. 2d 612, 617-618 (N.D. Ill. 2011) (*citing United States v. Mejia*, 448 F.3d 436, 455 (D.C. Cir. 2006)).

Accordingly, core relevancy and admissibility issues should not be decided in an *ex parte* vacuum, especially when the questions of materiality, relevancy, and helpfulness inherently require defense participation and input.  Indeed, in CIPA itself, Congress established procedures for defense counsel to access classified information relevant or helpful to the defense; and the Court should utilize those procedures to ensure that the Defendants' Fourth Amendment and Due Process rights are honored here.  *United States v. Dumeisi*, 424 F.3d 566, 578 (7th Cir. 2005) (quot*ing United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002)) (primary purpose of CIPA is to "protect and restrict the discovery of classified information in a way that does not impair the defendant's right to a fair trial.").  In addition to CIPA's procedures, district courts can fashion protective orders that allow cleared counsel to review classified information.[2]

Thus, should the prosecutors attempt to use *ex parte* proceedings in this case to litigate suppression questions beyond CIPA's limited scope, and in violation of due process, undersigned

---

[2] *See, e.g., United States v. al-Fawwaz*, No. S7 98-cr-1023 (LAK), 2014 U.S. Dist. LEXIS 173550, at *3-4 (S.D.N.Y. Apr. 15, 2014); *United States v. Abu Ali*, 528 F.3d 210, 254 (4th Cir. 2008).

counsel object and move for disclosure.  To that extent, counsel would respectfully request the Court's order precluding the prosecutors from using *ex parte* CIPA proceedings to determine Fourth Amendment suppression issues without any defense participation.

Additionally, undersigned counsel, both of whom possess security clearances, would also strongly encourage the Court to permit their participation in the Section 4 hearing to the fullest extent possible, including to assist the Court in making any relevancy and admissibility determinations.  Counsel submit that this participation is necessary, particularly with respect to complex issues relating to Defendant's prior cooperation with the FBI as a CHS; any and all surveillance, both overseas and domestically, of Defendant and her alleged co-conspirators; as well as surveillance, monitoring or other reconnaissance regarding Defendant's detention in Raqqa, Syria and then in Syrian camps prior to her return to the United States.[3]  These issues will be central to the defense of these very serious charges, and will most likely implicate classified evidence both before and during trial.

---

[3] If necessary, and with leave of Court, undersigned counsel will provide additional information and disclosures regarding these and other topics to assist in any relevancy determinations.  *United States v. Amawi*, 695 F.3d 457, 471 (6th Cir. 2012); *United States v. Rezaq*, 134 F.3d 1121, 1142 (D.C. Cir. 1998); *United States v. Libby*, 429 F. Supp. 2d 18, 26 (D.D.C. 2006) ("Accordingly, striking a balance between the Supreme Court's admonition in *Dennis* and Congress's adoption of Section 4, the Court will provide the defendant the opportunity to submit an *ex parte* affidavit from counsel detailing the defense so that the Court will be in a more informed position to determine whether the government's proposed redactions or substitutions for a particular document adequately provide the defendant with what he needs to pursue his defense.").  The government indicates it would have no objection to such a submission.  *See* Dkt. #47, p. 9 ("If defense counsel wishes to present its theory of the case or defense strategy in an *ex parte* proceeding, the government would have no objection.").  *But see* Dratel, *supra* note 1, 1059-60 ("Allowing the defense ex parte responses, setting forth the defense theory, is not a substitute because defense counsel cannot adequately articulate relevance or materiality in a vacuum, *i.e.,* without access to the government's legal and factual arguments themselves. Also, providing reciprocal ex parte contacts only further impairs the adversary process and unnecessarily institutionalizes secret proceedings, the very antithesis of our system of criminal justice. Rather than rectify the situation, instead it would further damage the adversary process.")

## II.      **PROCEDURAL BACKGROUND**

On March 21, 2018, while Defendant was detained in Syria, the grand jury returned an indictment that charged Defendant with making a false statement to the FBI on March 19, 2015, in violation of 18 U.S.C. § 1001.  (Dkt. #1).  Upon the return of the indictment, the government moved to seal the case until Defendant's arrest.  (Dkt. #2).  That request was granted and the matter was sealed.  (Dkt. #3).  The indictment did not identify the alleged false statement.  But, as was discussed at the December 20, 2018, detention hearing, given the date of the alleged false statement, undersigned counsel believe that the purported false statement was made during the course of Defendant's cooperation and work with the FBI as a confidential human source (CHS).  The government confirmed at the December 20, 2018, detention hearing that Defendant was in fact an FBI CHS prior to her arrival in Syria.  (Dkt. #53, p. 12).

On July 24, 2018, the government moved to unseal the matter and entire court file, with specified exceptions for matters that remained under seal. (Dkt. #7).  The motion to unseal the indictment was coordinated with the decision to return Defendant to this district pursuant to the arrest warrant issued on the sealed indictment.  (Dkt. #10).  On or about July 24, 2018, more than four months after the sealed indictment was returned and nine months after the FBI met with Defendant in a Syrian camp apparently run by the Syrian Democratic Forces (SDF), the FBI transported Defendant in custody with her four young children from Syria to Gary, Indiana by way of a military cargo transport plane.

On August 22, 2018, the grand jury returned a superseding indictment.  (Dkt. #23).  The superseding indictment charges Defendant with Conspiracy to Provide Material Support to ISIS, from Fall 2014 through Summer 2015, in violation of 18 U.S.C. §2339B(a)(1) (Count One) and

Aiding and Abetting two individuals in Providing Material Support to ISIS, from March 23, 2015 through April 7, 2015, in violation of 18 U.S.C. §2, §2339B.  Both counts reference Individuals A and B, who are believed to be Defendant's deceased husband and his brother (who may or may not be deceased), as was discussed during the December 20, 2018 detention hearing,

On August 2, 2018, the government filed a pleading entitled, "Government's Motion for Pretrial Conference Pursuant to the Classified Information Procedures Act and Memorandum of Law in Support Thereof."  (Dkt. #21).  The government submitted that pleading in order to provide an overview of CIPA's procedures, as it anticipated utilizing CIPA due to the nature of the evidence.  (*Id.*, p. 2).   On October 26, 2018, the government submitted another overview of the CIPA procedures in a pleading entitled, "Government's Statement of Law and Overview of the Classified Information Procedures Act."  (Dkt. #47).  As in its prior pleading, the government provided a "roadmap" of the key provisions in CIPA.  (*Id.*, p. 2).   While not discussing the specific facts of the case or how CIPA will apply to it, the government did note that it "began investigating Defendant and her co-conspirators several years before the instant charges were filed," which has resulted in "voluminous" discovery and will require CIPA motions and hearings.  (*Id.*).  The government also stated that it "anticipates that it will file a motion pursuant to CIPA Section 4."  (*Id.*, p. 11).

### III.    ARGUMENT

#### A.    CIPA Section 4 Should Not Be Used to Conduct *Ex Parte* Litigation and Resolution of Crucial Issues Without Any Defense Participation, Specifically Suppression Issues and Core Relevancy Determinations.

In enacting CIPA, Congress determined that it did not intend for a defendant to stand in a worse position merely because the case involved classified information.  *Poindexter*, 698 F.

Supp. at 320 (citing 1980 U.S. Code Cong. & Admin. News 4294, 4302).  Thus, any prosecution effort to litigate Defendant's right to suppression entirely in a secret *ex parte* setting is inconsistent with CIPA itself.  In enacting CIPA, Congress established a process that allows courts to make relevancy determinations when discovery implicates classified information.  However, the Court should also be hesitant to rely exclusively on *ex parte* proceedings to make core relevancy and admissibility determinations without any participation of defense counsel.

### 1.  Classified Evidence That is Relevant and Helpful to the Defense Must be Produced to Cleared Defense Counsel Under CIPA.

CIPA's fundamental purpose is to regulate the discovery of classified information "in a way that does not impair the defendant's right to a fair trial." *Dumeisi*, 424 F.3d at 578. It is a procedural tool that requires a court to rule on the relevance of classified information before it is disclosed or admitted into evidence.  *Id*.  Section 4 of CIPA, which sets forth the procedures for "[d]iscovery of classified information by defendants," provides in full:

> The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove.  The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone.  If the court enters an order granting relief following such an ex parte showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

18 U.S.C. App. 3, § 4.  This provision "does not create any new rights of or limits on discovery of classified information, but rather clarifies a court's existing powers under Rule 16(d)(1) to protect a government privilege in classified information."  *Hanjuan Jin*, 791 F. Supp. 2d at 617-618 (citing *Mejia*, 448 F.3d at 455).

In this way, CIPA, including Section 4, does not narrow—let alone eliminate—Defendants' longstanding rights to notice and disclosure of surveillance or other issues that are relevant for potential suppression motions.  Further, nothing in CIPA permits the government to make such *ex parte* submissions as a matter of right.  Rather, the use of the permissive "may" in the plain text of CIPA Section 4, rather than the mandatory "shall," makes it clear that courts retain discretion to reject *ex parte* submissions on a case-by-case basis.[4]

Thus, if classified information is discoverable—or even arguably discoverable—CIPA provides that the prosecutors may apply to the court for a protective order.  18 U.S.C. app. §3, 4.  The Seventh Circuit has not directly addressed the standard that a district court should use to analyze the government's request for a Section 4 protective order.  *See Hanjuan Jin*, 791 F. Supp. 2d at 618; *United States v. Turner*, No. 13 CR 572-2, 2014 U.S. Dist. LEXIS 105042, at *5 (N.D. Ill. June 16, 2014).

Other federal appellate courts have considered the proper standard of review for analyzing the prosecutors' request for a Section 4 protective order.  These courts have adopted variations of a standard that requires disclosure of classified information to the defense when that information is "relevant and helpful" to the defense or "essential to a fair determination of a

---

[4] In contrast, when Congress intends to require ex parte procedures in the national security setting, it knows how to articulate that mandate. For example, in the Foreign Intelligence Surveillance Act ("FISA"), Congress declared that the Court "shall" review FISA applications, orders, and related materials ex parte if the Attorney General submits an affidavit asserting that an adversarial proceeding would harm national security. See 50 U.S.C. §1806(f) (2000).  This is just one reason that distinguishes FISA from CIPA, which are historically and procedurally distinct laws.  For example, FISA authorizes disclosure of FISA warrants and applications to defense counsel when a district court deems it "necessary to make an accurate determination of the legality of the surveillance."  50 U.S.C. § 1806(f).  In contrast, under CIPA classified material must be disclosed to defense counsel if it is deemed relevant and helpful to the defense.  As such, undersigned counsel disagrees with the government's assertion that standards concerning FISA are "equally applicable in the instant context."  (Dkt. #47, p. 7 footnote 3).

cause." *See Hanjuan Jin*, 791 F. Supp. 2d at 619 (citing *United States v. Yunis*, 867 F.2d 617, 622, 276 U.S. App. D.C. 1 (D.C. Cir. 1989); *United States v. Aref*, 533 F.3d 72, 79-80 (2d Cir. 2008) (information is "helpful or material"—and must be disclosed—if it is "useful to counter the government's case or to bolster a defense"); *United States v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004); *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1261 (9th Cir. 1998); *United States v. Varca*, 896 F.2d 900, 905 (5th Cir. 1990); *United States v. Smith*, 780 F.2d 1102, 1107-10 (4th Cir. 1985); *United States v. Pringle*, 751 F.2d 419, 427-28 (1st Cir. 1984)). Importantly, information may be "helpful without being 'favorable' in the *Brady* sense." *Mejia*, 448 F.3d at 457.  *See also Hanjuan Jin*, 791 F. Supp. 2d at 619 ("helpful" means that there is "more than a mere showing of theoretical relevance").

Moreover, courts applying CIPA's procedures have recognized that they must give defendants "the benefit of the doubt" when determining whether information may be relevant or helpful. *Mejia*, 448 F.3d at 458 (citing *Yunis*, 867 F.2d at 624); *see also United States v. Price*, 566 F.3d 900, 913 n.14 (9th Cir. 2009) ("[I]f doubt exists, it should be resolved in favor of the defendant and full disclosure made.") (quoting *United States v. Acosta*, 357 F .Supp. 2d 1228, 1239-40 (D. Nev. 2005));. *Rezaq*, 134 F.3d at 1142  ("A court applying this rule [under Section 4 of CIPA] should, of course, err on the side of protecting the interests of the defendant.")  *See also United States v. Brown*, No. 5:14-CR-58-FL, 2014 U.S. Dist. LEXIS 54143, at *12 (E.D.N.C. Apr. 18, 2014) ("Even though CIPA allows § 4 proceedings to be held *ex parte*, and courts have upheld the *ex parte* nature of these proceedings, the court's decision-making regarding the 'relevant and helpful' nature of certain classified materials may be enhanced if

cleared defense counsel are involved in some adversary proceeding with the government.").[5]

Classified information may be produced to cleared defense counsel under appropriate safeguards such as protective orders.  For instance, in *United States v. al-Fawwaz*, No. S7 98-cr-1023 (LAK), 2014 U.S. Dist. LEXIS 173550, at \*3-4 (S.D.N.Y. Apr. 15, 2014) Judge Lewis A. Kaplan entered a protective order that "grants defense counsel who have received security clearance access to all discoverable materials, including information that is classified."  *See also United States v. Abu Ali*, 528 F.3d 210, 254 (4th Cir. 2008) (noting that before the district court "CIPA-cleared defense counsel was provided with the classified versions and afforded unfettered opportunity to cross-examine the government's witnesses concerning these matters."); *Brown*, 2014 U.S. Dist. LEXIS 54143, at \*12 ("Where defense attorneys in a case have been granted the security clearances necessary to view the classified materials at issue, and a court has issued a detailed protective order prohibiting unlawful disclosures, while neither of these factors *per se* entitles defense counsel to view classified materials, they may weigh in favor of more complete disclosure of information.").

Thus, because CIPA "does not expand or restrict established principles of discovery," (*United States v. Sedaghaty*, 728 F.3d 885, 904 (9th Cir. 2013)), it preserves Defendant's rights to notice and disclosure of surreptitious surveillance of her and her co-conspirators, and to obtain relevant and helpful material.  Even if such information is in fact privileged, the DOJ's privilege must "give way . . . to a criminal defendant's right to present a meaningful defense." *United*

---

[5] *See also United States v. Marzook*, 412 F. Supp.2d 913, 921 (N.D. Ill. 2006) (internal citation and quotation omitted) (in deciding whether to close a hearing to the public because of potential classified information, Judge St. Eve quoted *Stein v. Dep't of Justice & Fed. Bureau of Investigation*, 662 F.2d 1245, 1254 (7th Cir. 1981): "[i]t is a matter of conjecture whether the court performs any real judicial function when it reviews classified documents *in camera*. Without the illumination provided by adversarial challenge and with no expertness in the field of national security, the court has no basis on which to test the accuracy of the government's claims.").

*States v. Stewart*, 590 F.3d 93, 131 (2d Cir. 2009); *see Roviaro v. United States*, 353 U.S. 53, 60-61 (1957).

### 2.   CIPA Section 4 Does Not Permit *Ex Parte* Litigation of Fourth Amendment Suppression Issues.

CIPA does not permit the prosecutors to litigate core Fourth Amendment suppression issues entirely in secret, under the guise of "relevance."  If surveillance of Defendant or her alleged co-conspirators contributed to the intelligence agencies' investigation, then the surveillance must be disclosed so that Defendant has a meaningful opportunity to show that it was unlawful and that suppression is required.  For example, if the investigation involved secret surveillance that the prosecutors have labeled a mere "tip" or "lead" and if it has, on that basis, claimed in *ex parte* filings that the surveillance is "too attenuated" from the trial evidence, then that is not a question of relevance under CIPA.  Rather, it is a question of whether the Fourth Amendment exclusionary rule applies, *see Wong Sun v. United States*, 371 U.S. 471 (1963)—and that is a question that cannot and may not be resolved on the basis of the prosecutors' labels and unrebutted factual and legal claims.  *See Kolod v. United States*, 390 U.S. 136, 137 (1968).

For instance, the prosecutors may take the position that disclosure of surveillance of Defendant or her co-conspirators or disclosure of the conditions of Defendant's confinement in Syria are not "relevant or helpful" because—in its view—Defendant would not be entitled to suppression under the applicable Fourth (or Fifth) Amendment doctrines.  However, these arguments raise merits questions that cannot be pre-judged in secret without any defense participation. As discussed in more detail below, the Supreme Court has held in an analogous context that the prosecutors' unilateral representations concerning attenuation from taint cannot be relied upon, and that *ex parte* court review is insufficient to overcome the substantial risks of

error and prejudice to defendants, *see United States v. Alderman*, 394 U.S. 165, 182–84 (1969).

Moreover, and specifically with respect to unlawful surveillance, the cases demonstrate overwhelmingly that defendants are entitled to know about the *fact* of the surveillance in order to challenge it—even in cases implicating national security. *See United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.* ("*Keith*"), 407 U.S. 297, 324 (1972); *Kolod*, 390 U.S. at 137; *United States v. Belfield*, 692 F.2d 141, 146 (D.C. Cir. 1982); *United States v. Bissell*, 634 F.2d 1228, 1233 (9th Cir. 1980); *see also* 50 U.S.C. § 1806(c) (requiring notice of FISA surveillance). Simply put, even under CIPA disclosure is necessary for multiple reasons the relatively low "relevant or helpful" threshold; the need for courts to err on the side of disclosure; and because defendants must have a meaningful opportunity to seek suppression of unlawfully obtained evidence. The Fourth Amendment and Due Process require nothing less.

### B.   CIPA Section 4 *Ex Parte* Proceedings Should Not Be Used to Undermine the Adversarial Process.

The Supreme Court has emphasized that litigation of suppression issues, even in the national security setting, should not be done in an *ex parte* setting that undermines the adversarial process. In *Alderman*, , a case predating CIPA but also implicating national-security interests, the Supreme Court rejected the DOJ's effort to rely on an *ex parte* process to determine whether any of the government's evidence was based on evidence collected in violation of the Fourth Amendment, specifically, "illegally overheard conversations or conversations occurring on [the petitioner's] premises." *Alderman*, 394 U.S. at 180. Determining whether such evidence was, in fact, based on illegally collected evidence was essential to the petitioner's ability to make a suppression motion asserting that the evidence was the fruit of the poisonous tree. *See id*. (quoting *Wong Sun*, 371 U.S. a 488).

12

In *Alderman*, the government recognized that it must disclose "records which are relevant to the decision of this ultimate issue" and further acknowledged that "disclosure must be made even though attended by potential danger to the reputation or safety of third parties or to the national security—unless the United States would prefer dismissal of the case to disclosure of the information." *Alderman*, 394 U.S. at 181. The government argued that, rather than disclosure to defense counsel, the court, sitting *ex parte*, should first review the records to first determine if they are arguably relevant and then turn them over to the petitioner who "would then have the opportunity to use the disclosed information in his attempt to show that the Government has used tainted evidence to convict him." *Id.* at 181. The Supreme Court rejected the government's proposal.

The Supreme Court's rationale for doing so is quite pertinent for the anticipated CIPA issues in this case, particularly in the recognition of how the importance of certain information may only be apparent to defense counsel. On these points the Supreme Court stated as follows:

> Although this may appear a modest proposal, especially since the standard for disclosure would be "arguable" relevance, we conclude that surveillance records as to which any petitioner has standing to object should be turned over to him without being screened *in camera* by the trial judge. Admittedly, there may be much learned from an electronic surveillance which ultimately contributes nothing to probative evidence. But winnowing this material from those items which might have made a substantial contribution to the case against a petitioner is a task which should not be entrusted wholly to the court in the first instance. It might be otherwise if the trial judge had only to place the transcript or other record of the surveillance alongside the record evidence and compare the two for textual or substantive similarities. Even that assignment would be difficult enough for the trial judge to perform unaided. But a good deal more is involved. An apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances. Unavoidably, this is a matter of

> judgment, but in our view the task is too complex, and the margin for error too great, to rely wholly on the *in camera* judgment of the trial court to identify those records which might have contributed to the Government's case.

*Alderman*, 394 U.S. at 182.

Further, the Supreme Court's refusal to accept the government's proposal to use *ex parte* proceedings, rather than disclose evidence to defense counsel, was based in large part on the integral nature of adversary proceedings in criminal cases.  On this point, which is also relevant to the anticipated CIPA proceedings in this case, the Supreme Court stated as follows:

> Adversary proceedings are a major aspect of our system of criminal justice. Their superiority as a means for attaining justice in a given case is nowhere more evident than in those cases, such as the ones at bar, where an issue must be decided on the basis of a large volume of factual materials, and after consideration of the many and subtle interrelationships which may exist among the facts reflected by these records. As the need for adversary inquiry is increased by the complexity of the issues presented for adjudication, and by the consequent inadequacy of *ex parte* procedures as a means for their accurate resolution, the displacement of well-informed advocacy necessarily becomes less justifiable.

*Alderman*, 394 U.S. at 183-84.  These observations are particularly germane to this case, which undoubtedly presents complex issues for adjudication, including a multi-year, international national security investigation involving a former FBI cooperator and an international, oversees armed conflict.

*Ex parte* litigation of suppression issues in this case would also violate Defendant's Due Process rights.[6]  Put simply, courts are not equipped to stand in for defense counsel when

---

[6] As well they should be, *ex parte* proceedings are exceedingly disfavored. As the Sixth Circuit has cautioned, "[d]emocracies die behind closed doors." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002). As the Ninth Circuit Court of Appeals has observed, "*ex parte* proceedings are anathema in our system of justice." *Guenther v. Commissioner of Internal Revenue*, 889 F.2d 882, 884 (9th Cir. 1989), appeal after remand, 939 F.2d 758 (9th Cir. 1991). By their very nature, *ex parte* proceedings impair the integrity of the adversary process and the criminal justice system. And as the Supreme Court has recognized, "'[f]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights . . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of

resolving novel, close, or complex questions of fact and law. *See United States v. Abuhamra*, 389 F.3d 309, 322–23 (2d Cir. 2004) ("Particularly where liberty is at stake, due process demands that the individual and the government each be afforded the opportunity not only to advance their respective positions but to correct or contradict arguments or evidence offered by the other."); *American-Arab Anti- Discrimination Committee v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995) ("[T]he very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error.").

Suppression proceedings routinely involve extensive discovery, live testimony, and legal argument. The Court cannot reasonably replicate this inquiry on its own, taking on the role of surrogate defense counsel, especially in the face of extensive one-sided submissions by the government. Nor should it. Indeed, "in our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate." *Dennis v. United States*, 384 U.S. 855, 874-75 (1966); *see Libby*, 429 F. Supp. 2d at 23, *amended by* 429 F. Supp.2d 46 (recognizing that "there are fewer threats to national security in disclosing classified documents to a defendant and his attorney who have obtained security clearances, than when disclosure is made to someone who has not received security clearances").

Ultimately, neither CIPA nor due process permit using an *ex parte* proceeding to preclude and defeat suppression motions on the merits before defendants even know the grounds of the

---

serious loss notice of the case against him and opportunity to meet it.'" *United States v. James Daniel Good Real Prop*., 510 U.S. 43, 55 (1993) (in absence of exigent circumstances, Due Process clause requires government to provide notice and meaningful opportunity to be heard before seizing real property subject to civil forfeiture) (*quoting Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170-72 (1951) (Frankfurter, J., concurring)).

potential suppression motion, much less have a chance to bring the motion. *Alderman* and its progeny instruct that defendants are entitled to notice and disclosure of surveillance notwithstanding the DOJ's claim that its evidence is not "fruit of the poisonous tree." Indeed, in *Belfield*, 692 F.2d 141, the D.C. Circuit has recognized that the DOJ may not unilaterally assert that its evidence is untainted in order to conceal surveillance; it must instead disclose the fact of the surveillance to defendants so that this question can be fairly litigated. *See Belfield*, 692 F.2d at 146 ("[E]ven when the Government has purported not to be offering any evidence obtained or derived from the electronic surveillance, a criminal defendant may claim that he has been the victim of an illegal surveillance and seek discovery of the logs of the overhears to ensure that no fruits thereof are being used against him."); *see also Kolod*, 390 U.S. 136 (*per curiam*) (rejecting DOJ's unilateral determination that its evidence was not derived from challenged surveillance and requiring adversarial proceedings).[7]

This rule is consistent with the disclosure scheme Congress established in 18 U.S.C. § 3504, which requires the prosecution to "affirm or deny the occurrence" of allegedly unlawful electronic surveillance, so that a defendant has the opportunity to seek suppression. Likewise, in passing FISA, Congress recognized defendants' constitutional right to the type of information the DOJ has apparently sought to withhold under CIPA. *See* S. Rep. No. 95-701, at 65; H. Rept.

---

[7] Significantly, the secrecy the prosecutors have obtained through CIPA is even more extreme than the nondisclosure it unsuccessfully sought in *Alderman*. In *Alderman*, had the DOJ complied with its obligation to provide notice of the surveillance, by disclosing the fact of the wiretaps to the defense. Moreover, the DOJ conceded that it was required to disclose to the defense all wiretap recordings that were "arguably relevant" to the Fourth Amendment "fruit of the poisonous tree" determination. *See Alderman*, 394 U.S. at 181. Therefore, the DOJ in *Alderman* sought to withhold only certain recordings that it claimed were not even arguably relevant. But even that, the Supreme Court found, violated the defendants' right to a fair and accurate determination of the contested Fourth Amendment issues. *See also United States v. Alderisio*, 424 F.2d 20, 23 (10th Cir. 1970) (applying *Alderman* and holding that "no determination of relevance, 'arguable' or otherwise, will be made *in camera*").

1283 pt. 1 95-2, at 93 (1978) (a defendant "must be given confidential materials in the government's files to assist him in establishing the existence of 'taint'" (citing the Supreme Court's decisions in *Alderman* and *Keith*, 407 U.S. 313 ).

These authorities illustrate the problem with the DOJ's use of CIPA to conceal even notice of the existence of surveillance from defendants like Ms. El-Hassani. Prosecutors cannot rely on secret, one-sided submissions to convince the Court that an exception to the "fruit of the poisonous tree" doctrine should apply, that its surveillance was lawful, or that the good-faith exception should apply—all to avoid notice and foreclosing any challenge to its surveillance means and methods. Deciding these questions at the outset, before the defense has any opportunity to participate or even any knowledge of the surveillance, puts the cart far ahead of the horse. *See Belfield*, 692 F.2d at 146.

Instead, Defendant is entitled to know, among other things, whether she or alleged co-conspirators were subject to surreptitious electronic surveillance, to challenge the lawfulness of that surveillance, and then to test through fact-finding and adversarial litigation the extent to which the prosecutions' evidence is derived from any unlawful surveillance. Further, Defendant is also entitled to know additional details of her custodial status in the Syrian camps in which the FBI interrogated her. *See Alderman*, 394 U.S. at 181; *Keith*, 407 U.S. 297; 18 U.S.C. § 3504. In this way, the notice and disclosure requirements ensure that Defendant will have a meaningful opportunity to suppress unlawfully obtained evidence. The adversarial system demands it.

### C.  CIPA Has Been Used to Conceal Complex Fourth Amendment Suppression Issues Without Defense Participation.

Undersigned counsel's concerns about secret *ex parte* litigation of suppression issues are informed by official DOJ disclosures in 2015 that reveal that prosecutors have improperly relied

on the CIPA process to conceal surveillance in criminal cases. To be clear, no such allegations are directed at the prosecutors assigned to this case of the United States Attorney's Office for the Northern District of Indiana. Rather, the concern is based on general criticism of DOJ criminal discovery practices, as described by the Department of Justice Inspector General as far back as July of 2009, but not made public until September of 2015.

This OIG Report addresses the "Stellar Wind" surveillance programs, which intelligence agencies operated for years without congressional or judicial approval. The report severely criticizes the DOJ's criminal discovery practices and shows that prosecutors have has relied on CIPA's *ex parte* procedures to keep criminal defendants charged in material support cases from learning about warrantless surveillance used to monitor their communications and activities. *See* DOJ Office of the Inspector General, *A Review of the Department of Justice's Involvement with the President's Surveillance Program* (July 2009) ("OIG Report").[8]

Contrary to the DOJ's insistence that it is aware of and complies with its discovery obligations under the Federal Rules of Criminal Procedure and *Brady*, the Inspector General found that "the Department made little effort to understand and comply with its discovery obligations in connection with Stellar Wind- derived information for the first several years of the program"; and that after an initial efforts of an OLC attorney produced "a legal analysis that was based on an incorrect understanding of the facts of the case to which it applied," the Department's subsequent remedial efforts "[were] not complete and do not fully ensure that the government has met its discovery obligations." OIG Report, p. 357.

---

[8] The unclassified version of the OIG report is available at: https://oig.justice.gov/special/s0907.pdf. The full report is available at: https://oig.justice.gov/reports/2015/PSP-09-18-15-vol-III.pdf. Citations made herein to the "OIG Report" are to the full report.

One particular disclosure in the OIG Report is particularly relevant to the concerns raised in this pleading. The report makes clear that the DOJ has routinely sought to litigate core Fourth Amendment questions—including whether its evidence is the "fruit of the poisonous tree"—in secret in order to insulate surveillance from adversarial challenge.  According to the Inspector General, the DOJ's CIPA submissions in cases involving these surveillance programs

> uniformly stated that information in the NSA's intelligence reports had not been or would not be used as evidence, and that there was no causal connection between the information in the reports and any evidence used or to be used at trial, or was too attenuated from the evidence to be discoverable.  The government argued that because the facts concerning the NSA's reporting would not aid the defense, the court need not explore the sources and methods used to acquire the information. The submissions also argued that the information collected by the NSA was not included in the government's FISA application, and therefore was too attenuated from the trial evidence to merit a review of the means by which the intelligence information was gathered. The government asserted that the "causal connection" between discovery of the derivative evidence and the alleged illegal search "may have become so attenuated as to dissipate the taint."

OIG Report, p. 351 (footnotes omitted).  Thus, the prosecution would claim that its evidence was not "tainted" by the warrantless surveillance, despite the fact that other portions of the OIG Report call those assertions into question.  Based on its one-sided claims, the DOJ concealed its use of Stellar Wind surveillance from every criminal defendant who was subject to this warrantless wiretapping.  This improper practice ensured that neither the surveillance nor the DOJ's "taint" claims were ever subject to an adversarial challenge.

In short, the 2009 OIG Report and other materials show that the DOJ has used the CIPA process to make one-sided claims in an *ex parte* setting about why its evidence was not tainted by secret surveillance.  When making these arguments, prosecutors appears to rely on a variety of different theories in this context, including arguments that: (1) the surveillance was "too attenuated" from the trial evidence; (2) the surveillance was merely a "tip" or a "lead"; (3) any

19

warrants broke the causal chain; (4) the trial evidence was obtained from an "independent" source; and (5) the "inevitable discovery" exception applies.  Ultimately, these are complex legal and factual questions that cannot be accurately resolved in an entirely *ex parte* basis in a manner that is remotely consistent with due process.   Counsel respectfully encourage the Court to view with skepticism any similar arguments raised by the prosecutors in this case.

### 1.   CIPA Does Not Authorize Parallel Construction.

A related misuse of CIPA's procedures has recently come to light—involving the intelligence agencies' reliance on "parallel construction" to conceal the original sources of their evidence.  John Shiffman & Kristina Cooke, *U.S. Directs Agents to Cover Up Program Used to Investigate Americans*, Reuters, Aug. 5, 2013, available at: http://reut.rs/1h07Hkl (describing widespread use of "parallel construction" to conceal information obtained from intelligence agencies).  By definition, parallel construction conceals from defendants the existence of novel or controversial surveillance, by making it appear that the intelligence agencies relied on more innocuous or conventional methods.  In other words, parallel construction is designed to *deprive* defendants of relevant or helpful information—and, with it, the ability to bring an informed motion to suppress the prosecutions' evidence.

Official disclosures indicate that the DOJ has employed similar tactics in other settings. For instance, training documents released by DOJ's Drug Enforcement Administration show that the DOJ regularly relies on CIPA to withhold information about surveillance methods from defendants. *See* DEA Training Materials at 66-71, 84-92 (explaining how CIPA is used to cast surveillance tools as mere "tips and leads" and thereby avoid disclosure); *id.* at 62 (urging agents

to "See No Evil").[9]

Parallel construction is a possible issue of concern in this case.  To illustrate briefly, the government may very well argue that it did not learn that Defendant was actually in Syria until one of her family members contacted the FBI in late 2017.  This would be highly dubious claim for multiple reasons.  First, Defendant was an FBI confidential human source, and it would be expected that the FBI would take extra steps and measures to locate such an individual after she went "missing."  Second, and regardless of Defendant's service as an FBI confidential human source, it is believed that the FBI knew of the travel from other sources well before being contacted by Defendant's family member in 2017.  Third, one would most certainly expect that U.S. intelligence agencies monitored communications to and from Raqqa and other areas in Syria, particularly communications intended for individuals located in the United States and that implicated national security concerns.  Fourth, given the ongoing partnerships and alliances with local fighting forces in Syria, particularly the SDF and YPG, it would be expected that the FBI or other U.S. intelligence agencies would be notified once Defendant was identified as a U.S. citizen.  In other words, any narrative that asserts that Defendant's location in Syria was "discovered" after the FBI was contacted by a family member in late 2017 should be received with skepticism and as a possible indicator of parallel construction.

At this still early stage in the CIPA process, there have been no unclassified substitutions of classified evidence.  Thus, the defense has no way of knowing what those substitutions are—

---

[9]  These documents were released after a FOIA request submitted by the ACLU.  (*See* https://www.aclu.org/blog/free-future/aclu-foia-seeks-information-about-how-government-launders-evidence).   The records that were released in response to this request are available at: http://www.documentcloud.org/documents/1011382-responsive-documents.html#document/. (last visited Jan. 6, 2019). The page numbers above correspond to the page numbering of this undated PDF document.

and, as a consequence, no opportunity to raise any specific challenge to their adequacy.  Yet, to the extent the prosecution will seek to rely on CIPA substitutions to engage in parallel construction, those efforts should be rejected and appropriate disclosures ordered.

> **D.     The Prosecution Should Disclose to Cleared Defense Counsel Its Legal Standards, Arguments, and Interpretations in Support of Its Section 4 Application.**

Consistent with the goal of ensuring a defendant's right to a fair trial, CIPA provides multiple mechanisms for granting defense counsel access to sensitive information. *See* 18 U.S.C. app. § 4 (permitting the government to stipulate to relevant facts or to provide adequate substitutes); *Abu Ali*, 528 F.3d at 247 (CIPA vests courts with "wide latitude to deal with thorny problems of national security in the context of criminal proceedings.").   Should the Court determine a need to review the prosecution's CIPA Section 4 submission in camera in whole, or in part, it is respectfully requested that the prosecution be required to disclose to cleared defense counsel its legal arguments in support of non-production.   There is no sound reason why disclosure of the prosecution's legal arguments would implicate national security, especially when the arguments could be provided to defense counsel subject to an appropriate protective order.  *See supra*, pp. 9-10, citing *al-Fawwaz*; *Abu Ali*.[10]

---

[10] Counsel acknowledges that these arguments have not adopted by other district courts.  *See United States v. Mohammad*, No. 3:15-cr-358, 2017 U.S. Dist. LEXIS 90720, at *9;  (N.D. Ohio June 13, 2017); *United States v. Al Jayab*, No. 16 CR 181, unpublished opinion, Dkt. 115, p. 10 (N.D. Ill. Jun. 28, 2018).

## IV.   **CONCLUSION**

For the reasons set forth above, Defendant respectfully requests the Court enter an order prohibiting the prosecutors from using *ex parte* CIPA proceedings to litigate and determine Fourth Amendment suppression issues without any defense participation.   Additionally, Defendant requests that the Court permit, to the fullest extent possible, that undersigned cleared counsel to participate in Section 4 hearings to avoid *ex parte* relevancy and admissibility determinations.   Further, Defendant requests disclosure to cleared defense counsel of any material that is relevant and helpful to the defense.

Respectfully submitted,

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN,**

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**.

**THOMAS ANTHONY DURKIN**
**THE RERUM NOVARUM HUMAN AND**
**CIVIL RIGHTS CENTER OF CHICAGO**
**DURKIN & ROBERTS**
2446 North Clark
Chicago, Illinois 60614
(312) 913-9300
tdurkin@durkinroberts.com

**JOSHUA G. HERMAN**
**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
Fax: (312) 663-3707
jherman@joshhermanlaw.com

23

## <u>CERTIFICATE OF SERVICE</u>

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing Defendant's Response to the Government's Statement of Law and Overview of CIPA, and Objection to Secret, *Ex Parte* CIPA Litigation of Fourth Amendment Suppression Issues and Motion for Disclosure to Cleared Counsel was served on January 7, 2019, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 1650
Chicago, IL 60604
Tel: (312) 909-0434
Fax: (312) 663-3707
jherman@joshhermanlaw.com